UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

N⁰ 12-CR-317 (JFB)
_____

UNITED STATES OF AMERICA,

versus

JUVENILE MALE,

Defendant.
_____

**MEMORANDUM AND ORDER**
December 3, 2012
_____

JOSEPH F. BIANCO, District Judge:

On May 2, 2012, the government filed a Juvenile Information ("Information") against defendant Juvenile Male ("defendant") charging him with one count of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5), and one count of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1). The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On November 19, 2012, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[1] This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the Court finds that transfer of this case to district court for prosecution of the defendant as an adult is warranted in the interest of justice. More specifically, as discussed in detail below, after conducting a hearing and carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

Applying the statutory factors, it is clear that this is a compelling case for transfer to adult status. First, the nature of the alleged offense – the brutal, premeditated murder of a member of a rival gang – overwhelmingly favors, in the interest of justice, transferring

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. 18 U.S.C. § 5038(e). The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Information should be sealed.

the case to district court so that the defendant can be prosecuted as an adult. Moreover, this murder is alleged to have been committed as part of the defendant's participation in the racketeering activity of the violent La Mara Salvatrucha ("MS-13") street gang. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile justice system, including the limited sentencing options available in that system if defendant is found guilty (such as the statutory maximum of five years incarceration), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these grave charges when considered in conjunction with the other statutory factors. Second, with respect to the statutory factor regarding the defendant's age and social background, defendant allegedly committed the offense when he was 17 years and 4 months old, and he is now 20 years old. Defendant lived with his girlfriend until his current incarceration, and it appears that he would not be able to return to a stable home life if he was released from custody, due in part to his long affiliation with the MS-13 gang. Although defendant's background only slightly weighs in favor of transfer, both his current age and his age at the time of the commission of the offense strongly weigh in favor of transfer. Third, defendant's prior juvenile record, which includes a lengthy stay in a juvenile treatment facility, a probation violation, and adjudications for gang assault (which led to an individual's death), criminal possession of a weapon, petit larceny, possession of stolen property, and criminal trespass, strongly favors transfer. The fourth factor, the defendant's present intellectual development and psychological maturity, slightly weighs against transfer to adult status. Specifically, although Dr. N.G. Berrill, the forensic psychologist who examined defendant for the defense, determined that he suffers from Post-Traumatic Stress Disorder, Dependent Personality Disorder, and Adjustment Disorder, defendant "was living a lifestyle of a young adult prior to his incarceration." (Psychological Evlauation by Dr. N.G. Berrill, Sept. 25, 2012 ("Berrill Report") at 9-11.)[2] Moreover, the accuracy of the conclusions in Dr. Berrill's report may have been undermined by the fact that it appears, as elicited during cross-examination of Dr. Berrill at the hearing, that defendant provided some misleading and incorrect answers during his evaluation. Thus, this factor only slightly weighs against transfer. Fifth, the factor regarding past treatment efforts supports transfer because defendant's lengthy history of recidivism demonstrates that he has not responded positively to the substantial treatment he has received in the past. Finally, although the sixth factor weighs against transfer, given the apparent availability of out-of-state juvenile facilities with programs designed to treat defendant's behavioral problems, this factor does not outweigh the other factors. In particular, the serious and violent nature of the offense, couple with the defendant's extensive criminal history and recidivism in the face of rehabilitative efforts, overwhelmingly favors transfer. In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined that the interest of justice would be served by treating the defendant as an adult in this case.

---

[2] Although defendant has submitted both redacted and unredacted versions of Dr. Berrill's report, the Court has relied on Dr. Berrill's redacted version for purposes of this decision. The Court has read Dr. Berrill's unredacted report and does not find that the redacted text would alter its analysis.

2

I. THE CHARGES[3]

The charges against the defendant stem from his alleged involvement in MS-13, a criminal enterprise based in El Salvador and operating in Long Island, Queens, and elsewhere in the United States and Central America. (Gov't Mem. of Law at 2-3.) On Long Island, MS-13 is alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of both MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.*) Twenty-seven defendants allegedly associated with MS-13 were charged with various crimes in a 70-count superseding indictment filed on March 3, 2011 in *United States v. Prado*, No. 10-CR-074 (JFB).

As set forth in the government's transfer motion, defendant has been charged in connection with the murder of Luis Castro ("Castro"). According to the allegations in the government's submissions, in the summer of 2009, two members of the MS-13, co-conspirator #1 ("CC-1"), and co-conspirator #2 ("CC-2") traveled to New York from El Salvador and California for the purpose of killing Castro, whom they believed to be a member of the rival 18th Street Gang. (*Id.* at 6-7.) When they arrived in New York, CC-1 and CC-2 discussed their plan with co-conspirator #3 ("CC-3") and defendant, both of whom were members of the Roosevelt Locos Salvatruchas ("RLS") clique of MS-13. (*Id.* at 6.)

In October 2009, defendant, CC-3, and other members of MS-13 were at a bar when they spotted Castro, an acquaintance of defendant. (*Id.* at 7.) Castro, defendant, and CC-3 left the bar and smoked marijuana together. (*Id.*) Defendant, CC-3, co-conspirator #4 ("CC-4"), and two other members of MS-13 from El Salvador then lured Castro into a car by convincing him to go to a party with them. (*Id.* at 7-8) During the drive to the supposed destination, CC-4 stopped the car. Castro was forced out of the car, and CC-3, CC-4, and the two other MS-13 members repeatedly stabbed Castro. (*Id.* at 8.) Defendant claimed that he did not actually stab Castro during the attack, but got blood on his knife by pretending to stab the victim. (*Id.*) However, according to the government, defendant later admitted to police that as the assailants were running back to the car, CC-3 ordered defendant to "do something." When defendant went back to see if Castro was still alive, and noticed that he was, defendant stabbed Castro at least two more times before fleeing the scene. (*Id.*) The Suffolk County Police Department found the body on October 4, 2009. (*Id.* at 6.)

II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the

---

[3] The allegations set forth herein were drawn from the government's motion papers and supporting documentation, including the Juvenile Information. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as set forth by the government and takes no position as to the relative strength of the evidence supporting those allegations.

3

interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[4] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish, by a preponderance of the evidence, that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*,

---

[4] In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law, Ex. 3.)

4

90 F.3d at 640 (citations and alterations omitted).[5]

III. ANALYSIS OF FACTORS

A. Juvenile's Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citation omitted)).

In this case, defendant was 17 years and 4 months old at the time of the alleged murder, and 20 years and 5 months old at the time of the hearing. The defendant's age at the time of the crime weighs in favor of transfer. *See United States v. Doe,* 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16 ½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. C.P.A.*, 572 F. Supp. 2d 1122, 1126 (D.N.D. 2008) (defendant's age of 17 years 8 months at time of offense and age of 18 at the time of hearing favored transfer); *United States v. H.V.T.*, No. 96–cr–244, 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer."); *see also United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) (stating that several courts have concluded "that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult" (internal citations omitted)). Defendant's current age also weighs in favor

---
[5] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

of transfer. Insofar as rehabilitation is one of the primary focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of 20 years and 5 months, which would allow him only five years[6] in a juvenile detention facility to rehabilitate himself (if adjudicated guilty as a juvenile), weighs in favor of transfer. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *Juvenile Male*, 554 F.3d at 468-69 ("[W]e agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21.").

The Court finds that defendant's social background also weighs in favor of transfer.

---

[6] *See* 18 U.S.C. § 5037(c)(2)(A)(i)-(ii) ("The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend . . . in the case of a juvenile who is between eighteen and twenty-one years old (A) who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond the lesser of (i) five years or (ii) the maximum of the guideline range . . . applicable to an otherwise similarly situated adult defendant . . . .")

Defendant was born in Guatemala and moved to the United States when he was 11 years old. (Berrill Report at 2.) He reported that his father was not present during his childhood. (*Id.*) Defendant has primarily lived with his mother during his time in the United States, but he moved in with his girlfriend prior to his incarceration. (*Id.* at 3; Def.'s Opp'n at 3.) Defendant is the father of an eighteen month old daughter. (Berrill Report at 3.)

The defendant has completed tenth grade; he does not have a GED. (*Id.* at 4.) He has not had any vocational training. (*Id.*) As to substance abuse, defendant reports that he used to drink alcohol on a regular basis, and used to smoke marijuana occasionally. (*Id.*) There is evidence that defendant has been taking medications for which he does not have a prescription. (Gov't Mem. of Law at 12.)

The Court finds that defendant's background indicates that it is unlikely that he would be able to rehabilitate himself in the short period of time before he would have to be released from juvenile custody if he were convicted on the offenses charged. Dr. Berrill testified at the hearing that, absent a structured environment, defendant would not be able to properly rehabilitate. Defendant's unstable home life, along with his long-standing affiliation with MS-13, present exactly the type of unstable environment and social surroundings that make it highly unlikely that defendant can rehabilitate himself and avoid criminal behavior. *See Doe*, 49 F.3d at 867 (finding that district court did not abuse its discretion in concluding that juvenile's "long association" with a gang weighed in favor of transfer). In other words, there is every indication that, after additional rehabilitation in a juvenile facility, defendant would be returned to the same unstructured

6

environment that, as Dr. Berrill acknowledged, had thwarted any past rehabilitation efforts.

In sum, defendant's age of 17 at the time of the crime weighs strongly in favor of transfer, defendant's current age of 20 weighs strongly in favor of transfer, and defendant's social background weighs slightly in favor of transfer. Accordingly, the age and social background factor weighs strongly in favor of transfer.[7] *See, e.g.*, *United States v. Juvenile (I.H., Jr.)*, 1 F. Supp. 2d 509, 518 (D.V.I. 1998) ("I.H.'s age at the time of the offenses [16 at time of carjacking and rape; 17 at time of robbery] and at the time of transfer [19] auger in favor of transferring him for prosecution as an adult.").

B. Nature of the Offense Alleged

As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offense charged in the Information is serious and extremely violent. Defendant and his co-conspirators are alleged to have stabbed and murdered an individual in furtherance of the MS-13's bloody gang feuds with rival gangs. The murder was premeditated, with two of the co-conspirators allegedly having traveled to New York for the purpose of planning this murder. Defendant allegedly used his acquaintance with the victim to lure him into a car with the intention of killing him. Defendant allegedly admitted to returning to the victim shortly after the attack to deliver at least two additional stabbings, apparently in an effort to make sure that Castro was in fact dead.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See Nelson I*, 68 F.3d at 590 ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors."). An intentional murder such as the crime alleged here constitutes the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious – or even, in some cases, less serious – than the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six

---

[7] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See, e.g.*, *United States v. Jerry Paul C.*, 929 F. Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant to adult status where his age of 15 weighed against transfer, but other factors "tilt[ed] in favor of transfer").

7

statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe #1*, 74 F. Supp. 2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F. Supp. at 766 ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, [the defendant] has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, [the defendant] would have been accused not only of attempted robbery, but of murder.").[8]

---

[8] The Court acknowledges that there are juvenile transfer cases in which the defendant allegedly committed murder, but was not transferred to adult status. *See, e.g.*, *United States v. A.F.F.*, 144 F. Supp. 2d 797 (E.D. Mich. 2001); *United States v. Leon D.M.*, 953 F. Supp. 346 (D.N.M. 1996); *United States

## C. Nature and Extent of Any Prior Delinquency Record[9]

---

*v. M.L.*, 811 F. Supp. 491 (C.D. Cal. 1992). As an initial matter, the Court notes that each of these cases are factually distinguishable from the defendant's case. For example, in *Leon D.M.* and *M.L.*, the defendants had not received any prior treatment and had either no, or very minor, delinquency records. Likewise, the nature of the offense in *A.F.F.* is distinguishable from the offense alleged here – although both *A.F.F.* and the defendant here were charged with murder, the murder alleged in *A.F.F.* had no ties to any organized gang activity and instead was related to a child abuse incident that "was not motivated by personal gain, greed or avarice, but rather resulted from an apparent psychological reaction to circumstances with which the defendant could not cope." *A.F.F.*, 144 F. Supp. 2d at 803. The decision whether to transfer a juvenile to adult status is a fact-specific inquiry that is left to the sound discretion of the district court and is based upon a number of statutory factors and considerations, as discussed herein. Accordingly, the Court finds these cases to be unpersuasive and further finds, for the reasons discussed *supra*, that when the nature of the offense is analyzed and balanced in conjunction with the other statutory factors under the particular circumstances of *this* case, transfer to adult status is clearly warranted.

[9] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999), *cert. denied* 528 U.S. 897 (1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain

Defendant's criminal history dates back to March 13, 2006, when he was arrested at the age of 13 for Criminal Trespass in the Third Degree for harassing a teacher while suspended from school. (Gov't Reply at 3.) On August 14, 2006, he was adjudicated a juvenile delinquent and placed on probation for two years. (*Id.* at 4.) Defendant violated probation soon thereafter for being absent from over 100 classes at his high school and for being a member of the MS-13 gang. (*Id.*) On January 10, 2007, a Nassau County Family Court judge remanded defendant to a juvenile facility for diagnostic evaluation, and on that facility's recommendation, on February 5, 2007, the Family Court judge placed defendant in a residential treatment center for one year. (*Id.* at 4-5.)

On March 30, 2009, when he was 16 years old, defendant and two other individuals were arrested for Criminal Possession of Stolen Property in the Fourth Degree. (*Id.* at 5.) On September 18, 2009, defendant was adjudicated as a youthful offender and was sentenced to time-served. (*Id.*) On July 3, 2009, defendant was arrested for unlawful possession of marijuana. (*Id.*) It does not appear he was convicted, and therefore the Court declines to consider this arrest in its determination.

On October 4, 2009, defendant is alleged to have killed Castro. On October 8, 2009, just four days later, defendant and two others were arrested for Attempted Robbery in the First Degree and Criminal Possession of a Weapon in the Fourth Degree for wielding a machete and demanding money from the victim. (*Id.* at 5; Gov't Mem. of Law at 10.) On January 28, 2010, defendant pled guilty to Petit Larceny, a Class A misdemeanor, and was sentenced to 89 days' imprisonment. (Gov't Mem. of Law at 10.)

On December 23, 2010, when defendant was 18 years old, defendant and at least five other members of the MS-13 gang attacked four individuals whom they believed were members of a rival rang. (*Id.* at 10-11.) Two of those individuals were stabbed, one of whom died from his wounds. (*Id.* at 11.) On December 1, 2011, defendant pled guilty to two counts of Gang Assault in the First Degree. (*Id.*) Despite being 18, defendant was adjudicated as a youthful offender and sentenced to between one and one-third and four years' imprisonment. (*Id.*)

While imprisoned at the Nassau County Correctional Facility, corrections officers allegedly discovered numerous prescription medications in defendant's possession for which he did not have prescriptions. (*Id.* at 12.) Since defendant was not arrested or convicted for this activity, the Court will not consider this in making its decision.

---

language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.*, 203 F.3d 955, 962 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 315 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor" (citation omitted)). *But see In re Sealed Case*, 893 F.2d 363, 369 n.12 (D.C. Cir. 1990) ("But since . . . the purpose of the Act is rehabilitation and not punishment, Congress could not have contemplated the hearing to focus on a plethora of uncharged and unproven offenses."). In any event, this Court need not resolve this question because the Court has considered only the offenses of which the defendant was adjudicated guilty, and not the offenses for which the defendant was arrested. The Court is not considering any conduct that related solely to an arrest.

9

This record demonstrates that defendant has been committing crimes since he was 13 years old. He has also engaged in increasingly serious crimes, escalating from harassment and possession of stolen property to violent crimes, including his participation in a gang fight that resulted in murder, and the brutal murder for which he is charged in this case. The Second Circuit has noted that "[w]here a juvenile has committed serious adult offenses shortly after the alleged act of delinquency, a presumption may well arise that it would be a futile gesture to pursue juvenile proceedings." *Nelson I*, 68 F.3d at 590. Given his prior record of recidivism, including his participation in a fight when he was 18 years old that led to the murder of an individual, the Court finds that this factor weighs strongly in favor of transfer. *See United States v. Juvenile Male #2*, 761 F. Supp. 2d 27, 40 (E.D.N.Y. 2011) ("As this record indicates, for the past several years, the defendant has been in-and-out of juvenile detention facilities and has continued to engage in criminal activity that was tied, at least in part, to his membership in MS-13. Moreover, although the defendant pled guilty only to misdemeanors, the record indicates that both convictions stemmed from serious conduct, including possession of a two-foot long machete. . . . Given the defendant's prior record of recidivism, the Court finds that this factor strongly weighs in favor of transfer."); *Doe #1*, 74 F. Supp. 2d at 321 ("[T]he court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant. . . . Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior."); *United States v. D.R.*, 225 F. Supp. 2d 694, 701-702 (E.D. Va. 2002) (holding that "defendant's lengthy juvenile record clearly militates in favor of a transfer to adult status").[10]

D. Juvenile's Present Psychological Maturity and Intellectual Development

Defendant underwent a psychological examination conducted by Dr. Berrill, a forensic psychologist who prepared an evaluation of the defendant for the defense. Dr. Berrill examined the defendant on August 20, 2012, and prepared a report two weeks later. During the examination, Dr. Berrill conducted a mental status exam and administered several psychological tests, including the Millon Clinical Multiaxial Inventory, Third Edition (MCMI-III), the Wechsler Abbreviated Scale of Intelligence (WASI), and the Wide Range Achievement Test, Fourth Edition (WRAT-4). (Berrill Report at 2.)

As to the defendant's intellectual development, his verbal skills are significantly below average and his visual-motor problem solving abilities are average according to the WASI. (*Id* at 6.) The WRAT-4 test indicates that defendant's English reading abilities place him in the 5th percentile, his spelling abilities are in the 13th percentile, and his arithmetic skills are in the 5th percentile. (*Id.* at 6-7.)

Regarding the defendant's psychological functioning, Dr. Berrill stated that the MCMI-III concluded that defendant "suffer[s] from symptoms that typify a Generalized Anxiety Disorder." (*Id.* at 7.) The defendant is a "frequently anxious and depressive man" who suffers from "pervasive suspiciousness" and has moods

---

[10] The fact that the more serious crimes defendant was previously convicted of occurred after the murder for which he is charged in this case "does not alter the importance of considering these convictions on the transfer motion." *Nelson I*, 68 F.3d at 590.

10

that "shift erratically." (*Id.* at 7-8.) The test results also determined that defendant suffers from Post-Traumatic Stress Disorder in connection with the murder for which he is charged, as well as Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Dependent Personality Disorder with borderline and paranoid personality features. (*Id.* at 9.) These results are similar, but not identical, to defendant's diagnosis at age 14 for "conduct disorder" and "depressive disorder." (Gov't Reply at 8.) Dr. Berrill concluded that his "cognitive and emotional level of functioning can be described as extremely immature, highly dependent and to some degree, similar to what one might find in an adolescent." (Berrill Report at 11.)

However, based on the record in this case, including the evidentiary hearing and Dr. Berrill's report, the Court finds that this factor only slightly weighs against transfer. On the one hand, Dr. Berrill determined that defendant's verbal skills and academic achievement are well-below average, he suffers from Post-Traumatic Stress Disorder as well as other disorders, and he is a highly dependent individual who, overall, has a cognitive and emotional level that is extremely immature. (Berrill Report at 6-11). On the other hand, Dr. Berrill reports that defendant's visual-problem solving abilities are average, and defendant "was living a lifestyle of a young adult prior to his incarceration, inasmuch as he reports that he was holding down a full-time job and residing with his girlfriend and the couple's child." (*Id.* at 11.) Thus, there is evidence that the defendant was already functioning as a young adult at the time of his alleged criminal conduct and incarceration, a fact that would weigh against transfer.

In addition, some of Dr. Berrill's conclusions are undermined by the fact that, based upon the evidentiary hearing and other evidence in the record, it appears that defendant did not give Dr. Berrill completely accurate information, and that Dr. Berrill also lacked certain information about defendant's past criminal activity. For example, although defendant told Dr. Berrill that he is not a member of MS-13, there is evidence that he has told both doctors and FBI agents that he is a member of the gang. (Gov't Reply at 7.) In addition, Dr. Berrill concluded, with respect to the alleged murder that is the subject of the Information, that "[a] review of Angel's psychological test results do, in fact, support the idea that he was terrified or shocked by the nature of the crime that was committed." (Berrill Report at 10.) Dr. Berrill further notes that there is evidence that the defendant suffers from symptoms consistent with Post-Traumatic Stress Disorder and that the defendant "indicated that he is tortured by intrusive thoughts about the crime and insists that he knew nothing of plans to hurt or kill Mr. Castro when he took a ride with his Salvardoran friends/acquaintances on the night of the instant offense." (*Id.*) As a threshold matter, Dr. Berrill does not address defendant's alleged statements to law enforcement that were completely inconsistent with that version of events. Moreover, Dr. Berrill does not address that (a) four days after the alleged murder, the defendant was alleged to have been involved in an attempted robbery with a machete, which resulted in a guilty plea to petit larceny, and (b) about one year later, defendant was alleged to have been involved in a gang-related stabbing that caused the death of one victim, which resulted in a guilty plea to Gang Assault in the First Degree. This type of criminal conduct appears to be inconsistent with the psychological tests that suggested to Dr. Berrill that the defendant was "terrified or shocked" by the murder of Castro.

11

In sum, although defendant's below-average intelligence and verbal skills, as well as his diagnosis of Post-Traumatic Stress Disorder, Dependent Personality Disorder, and Adjustment Disorder weigh against transfer, the Court finds that this factor only slightly weighs against transfer for the above-referenced reasons. In any event, even if this factor strongly weighed against transfer, it does not outweigh all of the other factors favoring transfer. *See, e.g.*, *A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); *H.V.T.*, 1997 WL 610767, at *5 ("Both psychologists testified that H.V.T.'s intelligence was probably in the low average range, indicating no mental retardation. As to psychological maturity, both experts agreed that H.V.T. lacks emotional and psychological resources. Dr. O'Neill characterized H.V.T.'s behavior as distant. However, again no evidence was submitted indicating that H.V.T. has the psychological maturity of a child. Dr. O'Neill testified that there was no indication that H.V.T. was out of touch with reality but that H.V.T.'s traits were characterological, fixed, and persistent and that they were unlikely to change over time. I find that the intellectual development and psychological maturity factor favors transfer." (internal citations omitted)).

### E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

At age 14, defendant was ordered to spend one year at a juvenile residential treatment facility as a consequence of his violation of parole. (Gov't Reply at 8.) During this year, defendant attended school and participated in both individual counseling and group therapy sessions. (*Id.*) Defendant did well academically in the classes he took at the facility, and "appeared better prepared for return to home and community." (*Id.* at 9.) In January 2008, at age 15, defendant was released from the facility. (*Id.*)

However, defendant quickly returned to his previous behavior. Less than three months after his discharge from the facility, he was suspended from school for weapons possession and promoting gang activity. (*Id.*) And as discussed *supra*, defendant was convicted of participating in several serious gang-related crimes, one of which led to the death of a rival gang member.

The Court finds that this factor weighs heavily in favor of transfer. It is clear from defendant's criminal history that the treatment efforts made at the juvenile residential hall had no impact on his recidivist tendencies. To the contrary, defendant spent almost an entire year at a facility undergoing intensive therapy, and yet soon after his release, he not only continued to participate in gang activity but began committing much more serious offenses. *See Doe #1*, 74 F. Supp. 2d at 321 ("Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior. . . . As rehabilitation is the primary purpose of the federal delinquency provisions, including § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted."). Defendant's actions strongly suggest that he not only failed to respond well to prior treatment efforts despite the appearance of progress, but also that it is likely that any efforts to rehabilitate him at this point would be futile or, at the very least, would involve a long-term

rehabilitative effort well beyond five years.[11] Accordingly, the Court concludes that this factor weighs heavily in favor of transfer.

F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserted that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 22.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*) The government further noted that the defendant is already eligible to be incarcerated in an adult facility because he is over 18 years old. (*Id.*)

The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Thus, the Court finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (internal quotation marks, alterations, and citation omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that the transfer of defendant to adult status is warranted in the interest of justice. As an initial matter, defendant is charged with a brutal murder in connection with MS-13 gang activity. This serious and violent type of crime strongly weighs in favor of transfer. Moreover, a review of the factors demonstrates that defendant is not likely to respond to rehabilitative efforts. For example, as described in detail *supra*, defendant has already failed to respond to prior rehabilitative efforts. Indeed, as indicated by defendant's criminal history, he began committing more serious crimes after he spent a year in a juvenile facility. Furthermore, the fact that he is already 20 years old, and was over 17 years old at the time of the offense, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to

---

[11] As noted *supra*, Dr. Berrill acknowledged at the hearing that the success of any future rehabilitative efforts would be contingent upon the defendant not returning to an unstable environment. However, there is no evidence that defendant would not return to such an environment upon his release.

provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). The Court finds, therefore, that defendant's rehabilitation potential is low.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here involve the "heinous . . . crime of intentional murder," *Nelson I*, 68 F.3d at 590, and given that the record demonstrates that defendant is unlikely to be rehabilitated, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer defendant to adult status is granted.

IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 3, 2012
       Central Islip, New York

\*   \*   \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by John J. Durham, Carrie N. Capwell, and Raymond A. Tierney, Assistant U.S. Attorneys. Defendant Juvenile Male is represented by John S. Wallenstein, 1100 Franklin Avenue, Garden City, New York 11530.